## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| CAROLYN FEATHERSTONE | ) |
| | ) |
| Plaintiff, | ) |
| v. | ) |
| | ) Case No. _____ |
| | ) |
| STATE OF KANSAS JUDICIAL | ) |
| BRANCH, | ) |
| | ) |
| Defendant. | ) |

## **COMPLAINT**

Plaintiff Carolyn Featherstone ("Plaintiff" or "Ms. Featherstone"), by and through undersigned counsel, for her claims and causes of action against the State of Kansas Judicial Branch ("Defendant" or "Judicial Branch"), states and alleges as follows:

### I.   **PARTIES AND SERVICE**

1. Plaintiff, Carolyn Featherstone, is a citizen of the United States and resides in the State of Missouri. At all times pertinent to this case, Plaintiff was employed by the State of Kansas Judicial Branch as supporting the 29th District Court in Wyandotte County, Kansas.

2. Defendant State of Kansas Judicial Branch is an agency of the State of Kansas and a public employer subject to the provisions of the Americans with Disabilities Act. At all times pertinent to this case, Plaintiff was employed by the State of Kansas Judicial Branch in Kansas City, Kansas. The State of Kansas Judicial Branch holds its usual place of business at 301 SW 10th Avenue, Topeka, KS 66612 USA. The Judicial Branch can be served through its General Counsel at Judicial Center – Room 315, 301 SW 10th Avenue, Topeka, KS 66612 USA.

3. Defendant may also be served through the Office of the Attorney General of Kansas, located at 120 SW 10th Avenue, 2nd Floor, Topeka, KS 66612-1597 USA. Attorney General Kris Kobach is the designated agent for service.

## II.   JURISDICTION AND VENUE

4. This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343, as this action arises under the laws of the United States, specifically the ADA. This Court has supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367.

5. Venue is proper in this judicial district under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to these claims occurred in Wyandotte County, Kansas, within the District of Kansas.

## III.   NATURE OF ACTION

6. This is an action under the Americans with Disabilities Act of 1990, as amended (ADA and ADAAA), 42 U.S.C. § 12101 et seq., and the Kansas Act Against Discrimination, K.S.A. § 44-1001 et seq., to correct unlawful employment practices on the basis of disability and to provide appropriate relief to Plaintiff, who was subjected to harassment, a hostile work environment, and retaliation following her protected request for reasonable accommodations.

## IV.   CONDITIONS PRECEDENT

7. The law allows individuals who have been discriminated against to file a lawsuit in federal court. This action is under 42 U.S.C. § 1981.

8. On February 9, 2024, Plaintiff filed a timely Charge of Discrimination (No. 563-2024-00248) with the Equal Employment Opportunity Commission (EEOC) alleging disability discrimination and retaliation.

9.   Subsequently, the EEOC issued Plaintiff a Notice of Right to Sue, received on February 24, 2025. The plaintiff files this lawsuit within ninety (90) days of receiving the Right to Sue notices. Therefore, this lawsuit is timely filed.

### V.   FACTS

10.   Plaintiff Carolyn Featherstone began her employment with the State of Kansas Judicial Branch on May 2, 2022, as a Domestic Court Services Officer I supporting the 29th District Court in Wyandotte County, Kansas City, Kansas. From the outset, she consistently performed her duties at or above expectations. She brought years of relevant experience to the position, was a valued team member, and routinely delivered timely and effective solutions to families navigating the court system.

11.   On May 30, 2023, after successfully completing her probationary period, Plaintiff was officially notified that she had been granted permanent staff status with the Kansas Court, effective May 2, 2023.

12.   Plaintiff suffers from a serious heart condition that qualifies as a disability under the Americans with Disabilities Act. Specifically, she has an implanted cardiac defibrillator, or ICD, and must be monitored regularly to prevent sudden cardiac events. Her condition requires that she avoid unnecessary physical exertion, maintain access to medication and diet management, and stay connected to a cardiac monitoring system.

13.   On September 26, 2023, Plaintiff formally disclosed her disability and requested reasonable accommodations. These included the ability to work from home on days where in-person presence was not required, a reserved parking space close to the building to minimize walking and physical exertion, and a flexible schedule to accommodate medical appointments and manage her health regimen. These requests

were based on medical necessity and aimed at ensuring Plaintiff could continue performing the essential functions of her job without jeopardizing her health.

14. On October 2, 2023, Plaintiff met with Anita Peterson, the Court Administrator and ADA Coordinator, to discuss her accommodation request. Peterson appeared receptive and professional during this meeting. On October 10, 2023, Peterson delivered a letter to Plaintiff formally accepting her requested accommodations. At that time, Plaintiff believed that her needs had been recognized and respected, and that her workplace would support her ongoing success and safety.

15. That same day, a fire occurred in the building. Plaintiff and a colleague were left behind during the evacuation and received no warning or instructions. They were forced to exit the building through smoke, a traumatic experience that directly endangered Plaintiff's heart condition. No accountability was provided for why Plaintiff's office did not receive an evacuation notice. In light of this traumatic event and consistent with her newly approved accommodations, Plaintiff notified her supervisor the next day that she would work remotely.

16. The following week, on October 17, 2023, Plaintiff attended a regularly scheduled staff meeting. The tone of the office was tense and unwelcoming. Plaintiff noticed her supervisor, Erin Barnes, behaving nervously and moving in and out of the room. Despite food being present for a coworker's birthday, the atmosphere was unusually uncomfortable. Before leaving the office that day, Barnes handed Plaintiff a sticky note stating that Peterson had left word for Plaintiff to come see her.

17. Believing it to be a routine follow-up regarding her accommodations, Plaintiff went to Peterson's office. Instead, she was subjected to an unexpected and demeaning

confrontation. Peterson's demeanor had completely shifted from their prior meeting. She handed Plaintiff another letter and stated coldly, "This time read the letter and let me know if you have questions." The tone of the letter sharply contradicted the earlier accommodation approval and included reprimands and veiled threats.

18. Peterson went on to criticize Plaintiff for utilizing her approved accommodations. She made derogatory statements such as, "What did you think — that you could work whenever you wanted," and "You blew it in the first week." These statements were delivered in a mocking, condescending tone that made Plaintiff feel humiliated, degraded, and unsafe. When Plaintiff asked if a response was required, Peterson curtly stated, "You do not need to respond. That is your copy."

19. The letter also contained factual inaccuracies and mischaracterizations of Plaintiff's conduct, including claims that Plaintiff failed to attend work without permission when, in fact, she had worked from home in accordance with her new accommodations and after a building emergency.

20. Plaintiff left the meeting emotionally shaken and confused. She no longer knew whether her accommodations remained in effect or whether they had been silently revoked. Following the meeting, Plaintiff experienced an escalation in workplace hostility. She faced increased scrutiny, coldness from colleagues, erratic supervisory behavior, and what appeared to be orchestrated miscommunications designed to undermine her credibility.

21. Despite having disclosed her disability and obtained formal approval for accommodations under the ADA, Plaintiff was treated as if she had done something wrong merely for attempting to preserve her health while performing her job. Plaintiff

attempted in good faith to clarify misunderstandings and ease tensions with her supervisors, including a long after-hours conversation with Barnes. But it became increasingly clear that her efforts to protect her health were being weaponized against her.

22. As of February 2025, Plaintiff's heart failure progressed to its final stages, and she was accepted into a clinical trial for an experimental drug that is still under test for FDA approval. In discussing her updated medical condition with Erin Barnes and inquiring about the possibility of a resolution, Plaintiff's request for additional accommodations was denied.

23. This toxic environment created a severe and pervasive hostile work atmosphere. Plaintiff was subjected to discrimination, bullying, intimidation, emotional abuse, and retaliatory conduct, all of which negatively impacted her health, her dignity, and her ability to continue in her position.

24. On or about April 30, 2025, Plaintiff Carolyn Featherstone received a formal written Notice of Proposed Discipline by Termination of Employment from Honorable Robert Burns, Chief Judge of the 29th Judicial District, acting as the appointing authority. The letter authored by Chief Judge Burns included the personal statement, "I can no longer trust you," despite the fact that the Plaintiff has never met him.

25. This Notice evidences Defendant's decision to terminate Plaintiff's employment based on alleged violations that Plaintiff disputes and contends are without proper justification. The disciplinary actions and proposed termination were motivated in whole or in part by Plaintiff's disability and her exercise of rights protected under the ADA, including her requests for reasonable accommodations. Additionally, Plaintiff's protected

activities, such as raising concerns about workplace conditions and compliance, were met with retaliatory actions culminating in this Notice. Thus, the alleged violations and resulting discipline are pretextual and constitute unlawful discrimination and retaliation under the ADA.

26. Plaintiff did not provide a written response within the deadline due to severe anxiety and emotional distress stemming from the hostile and intimidating actions taken by Defendant. This emotional state impaired Plaintiff's ability to engage fully, as she was protecting her health.

27. Plaintiff suffered from anxiety, chronic headaches, sleep disturbances, humiliation, and ongoing emotional distress as a result of the discriminatory and retaliatory conduct. She was ultimately forced to retain legal counsel to defend her rights, and seek accountability for the treatment she endured.

## **CAUSES OF ACTION**

### **COUNT I – DISABILITY DISCRIMINATION**
**Americans with Disabilities Act, 42 U.S.C. § 12101 et seq.**

28. Plaintiff incorporates by reference all of the foregoing allegations in each of the preceding paragraphs as if fully set forth herein.

29. The Americans with Disabilities Act (ADA), as amended by the ADA Amendments Act of 2008 (ADAAA), prohibits employers from discriminating against qualified individuals on the basis of a disability in regard to job application procedures, hiring, advancement, discharge, compensation, training, and other terms, conditions, and privileges of employment. 42 U.S.C. § 12112(a).

30. To establish a prima facie case of disability discrimination under the ADA, Plaintiff must show: (1) she is disabled within the meaning of the statute, (2) she is

qualified to perform the essential functions of her position with or without reasonable accommodation, and (3) she suffered an adverse employment action because of her disability. Smothers v. Solvay Chemicals, Inc., 740 F.3d 530, 544 (10th Cir. 2014).

31.     Plaintiff is a qualified individual with a disability under the ADA. She has a serious heart condition requiring an implanted cardiac defibrillator and continuous monitoring. Her condition substantially limits major life activities including walking, physical exertion, and cardiovascular function, and therefore satisfies the ADA's definition of disability.

32.     At all times, Plaintiff was qualified to perform the essential functions of her job with or without accommodation, and in fact had an unblemished work history and performance evaluations confirming her competence and contributions.

33.     Despite approving her reasonable accommodations, Defendant's agents, including ADA Coordinator Anita Peterson, thereafter subjected Plaintiff to disparate treatment, public humiliation, reprimands, and hostile conduct directly connected to her use of those accommodations.

34.     Defendant's discriminatory actions altered the terms and conditions of Plaintiff's employment and created a workplace in which she was treated less favorably solely because of her disability and her lawful effort to protect her health.

35.     Defendant's conduct constitutes unlawful discrimination in violation of 42 U.S.C. § 12112(a), and was willful, knowing, and in reckless disregard of Plaintiff's federally protected rights.

36. As a direct and proximate result of this discrimination, Plaintiff suffered emotional distress, mental anguish, loss of dignity, and incurred attorneys' fees and litigation costs.

## COUNT II – RETALIATION
## Americans with Disabilities Act, 42 U.S.C. § 12203

37. Plaintiff incorporates by reference all of the foregoing allegations in each of the preceding paragraphs as if fully set forth herein.

38. To establish a prima facie case of retaliation, Plaintiff must show that (1) she engaged in protected activity, (2) she suffered a materially adverse action, and (3) there is a causal connection between the protected activity and the adverse action. *Lincoln v. BNSF Ry. Co.*, 900 F.3d 1166, 1209 (10th Cir. 2018).

39. Plaintiff engaged in protected activity when she disclosed her heart condition and formally requested reasonable accommodations on September 26, 2023, which were approved on October 10, 2023.

40. Shortly thereafter, Defendant and its agents began retaliating against her through written reprimands, verbal humiliation, false accusations of misconduct, and undermining her standing with supervisors and colleagues. This retaliation was not only humiliating, but occurred mere days after the accommodations were granted, supporting a strong inference of causal connection.

41. Plaintiff's treatment was not based on performance deficiencies, but arose directly from her attempt to lawfully manage her disability in the workplace.

42. As a direct and proximate result of Defendant's retaliatory conduct, Plaintiff suffered emotional distress, anxiety, humiliation, and disruption to her professional reputation, and she incurred attorneys' fees and litigation expenses.

## COUNT III – HOSTILE WORK ENVIRONMENT
### Under the Americans with Disabilities Act

43. Plaintiff incorporates by reference all of the foregoing allegations in each of the preceding paragraphs as if fully set forth herein.

44. The Tenth Circuit recognizes that disability-based harassment may violate the ADA where the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment. *Bartee v. Michelin N. Am., Inc.*, 374 F.3d 906, 910 (10th Cir. 2004); *Lanman v. Johnson County*, Kan., 393 F.3d 1151, 1155 (10th Cir. 2004).

45. In this case, after disclosing her disability and securing approved accommodations, Plaintiff was met with ridicule, public reprimands, dismissive treatment, false accusations, and increasing scrutiny from management. Her approved medical accommodations were mocked, questioned, and used as a basis for reprimand. The tone and nature of communication from her supervisors shifted drastically, culminating in a hostile and psychologically unsafe work environment.

46. The conduct was severe and pervasive enough to alter the terms and conditions of her employment and would have negatively impacted the wellbeing of any reasonable person in Plaintiff's position.

47. Defendant is liable for the conduct of its agents and supervisors who engaged in this pattern of harassment and for its failure to prevent or correct the discriminatory behavior after becoming aware of it.

48. As a result, Plaintiff suffered significant emotional harm, physical stress due to her cardiac condition, and disruption to her ability to continue working with dignity and respect.

## COUNT IV – DISABILITY DISCRIMINATION AND RETALIATION
### (Violation of the Kansas Act Against Discrimination, K.S.A. § 44-1001 et seq.)

49. Plaintiff incorporates by reference all of the foregoing allegations in each of the preceding paragraphs as if fully set forth herein.

50. The Kansas Act Against Discrimination (KAAD) makes it unlawful for an employer to discharge, expel, or otherwise discriminate against a person because of disability. K.S.A. § 44-1009.

51. Plaintiff was a qualified employee with a medically verified disability and sought reasonable accommodations, which were granted. Shortly thereafter, she experienced adverse actions, including verbal harassment, reprimands, and systemic hostility that disrupted her ability to perform her duties.

52. Under Kansas law, Plaintiff is protected from both direct discrimination and retaliation. Defendant's conduct constitutes a violation of K.S.A. § 44-1001 et seq.

53. Defendant's acts were intentional and taken with disregard for Plaintiff's rights under state law. Defendant further failed to implement safeguards to prevent disability-related harassment or to properly investigate Plaintiff's complaints.

54. As a result, Plaintiff has sustained emotional distress, pain and suffering, reputational damage, and has incurred litigation expenses and attorneys' fees.

## VII. DAMAGES

55. Plaintiff sustained the following damages as a result of the actions and/or omissions of Defendants described hereinabove:

    a. Back pay from the date of her dismissal to present, with interest;

    b. Front pay in an amount the Court deems equitable and just to make Plaintiff whole;

    c. All reasonable and necessary attorney's fees incurred by or on behalf of Plaintiff;

    d. All reasonable and necessary costs incurred in pursuit of this suit;

    e. Compensatory damages and emotional pain;

    f. Pre- and post-judgment interest;

    g. Mental anguish in the past; and

    h. Mental anguish in the future.

## VIII. JURY DEMAND

56. Plaintiff demands a trial by jury and has tendered the appropriate fee with this Original Complaint.

## IX. PRAYER

WHEREFORE, PREMISES CONSIDERED, Plaintiff, Carolyn Featherstone, respectfully prays that Defendant, State of Kansas Judicial Branch, be cited to appear and answer herein and that upon a final hearing of the cause, judgment be entered for Plaintiff against Defendant for damages in an amount within the jurisdictional limits of the Court; together with interest as allowed by law; costs of court; and such other and further relief to which the Plaintiff may be justly entitled at law or in equity.

HAMILTON LAW FIRM LLC

By: /s/ Patrick A. Hamilton
Patrick A. Hamilton, KS Bar No. 16154
8700 Monrovia, Suite 310
Lenexa, KS  66215-3655
PHONE: (913) 647-7512
patrick@lenexalaw.com

and



Alfonso Kennard, Jr.
Texas Bar No. 24036888
Eddie Hodges Jr.
Texas Bar No. 24116523
Kennard Law, P.C.
5120 Woodway Dr., Suite 10010
Houston, Texas 77056
Main: 713.742.0900
Fax: 832.558.9412
Email: filings@kennardlaw.com
Email: alfonso.kennard@kennardlaw.com
Email: eddie.hodges@kennardlaw.com
ATTORNEYS FOR PLAINTIFF